# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00763-CV

**Antonio Nash, Appellant**

**v.**

**The Blood and Tissue Center of Central Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT NO. GN203828, HONORABLE PATRICK KEEL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In this employment discrimination case, Antonio Nash appeals from the trial court's summary judgment in favor of The Blood and Tissue Center of Central Texas ("BTC"). In three issues, Nash challenges the grant of summary judgment. Because we find that BTC carried its burden establishing its right to summary judgment while Nash failed to establish that any genuine issue of material fact remained, we affirm the trial court's judgment.

## BACKGROUND

Antonio Nash was employed as a facilities manager at BTC from October 2000 to May 2001, when he was fired. Nash was the only African-American candidate when he was selected

for the position over several qualified applicants by Denise Ballinger, the Director of Human Resources, and Arlin Hall, the Chief Financial Officer. Ballinger and Hall were Nash's supervisors during his employment at BTC and they ultimately made the decision to fire Nash.

Although Nash claims that he felt singled out based on his race starting his first day at BTC, the events leading to his termination began in the spring of 2001. In early April, Nash reported that Micah Benites, a subordinate "line-worker," was working under the influence of drugs and alcohol. Nash initially communicated this to Charlie Pate, Benites's direct supervisor, and to Hall. Nash then reported Benites's suspected drug use to Ballinger on May 1. The following day, Benites reported to Ballinger that he believed Nash violated BTC's sexual harassment policy. Specifically, Benites said that Nash made an inappropriate comment about a female housekeeper and that Nash gave his keys to another employee, telling him to bring the housekeeper to Nash's office.

Ballinger investigated both reports. Although witnesses corroborated Benites's allegations that Nash violated the company's sexual harassment policy, no one corroborated Nash's accusations that Benites used drugs or alcohol at work. Two witnesses also reported that Nash approached subordinate employees to initiate discussion about Benites's suspected alcohol use. Such conduct would violate BTC's confidentiality policy, which states that, if an employee suspects another employee of being under the influence, the employee must maintain strict confidence and only notify a supervisor and a representative from human resources about the concern. At the conclusion of the investigation, Ballinger and Hall met with Nash to discuss their findings. At that time, Nash accused Benites of being a convicted felon and said he obtained this information through

a criminal background check of Benites.[1]  Ballinger replied that it was "totally unacceptable" and against company policy for a manager to conduct a criminal background check on another employee without prior authorization.

Ballinger and Hall terminated Nash, citing three violations of company policy as the basis for their decision: engaging in sexual harassment, failing to keep his suspicions about another employee's possible drug use confidential, and running an unauthorized background check on another employee.  Nash disputes the allegations, but he acknowledges that Ballinger informed him that his termination was based on these three violations.

Nash obtained a "right to sue" letter from the Texas Commission on Human Rights in August 2002 and timely filed suit in the district court against BTC for racial discrimination, retaliation, and intentional infliction of emotional distress.  *See* Tex. Lab. Code Ann. §§ 21.051-.556 (West 1996).  BTC responded by moving for summary judgment, which the trial court granted in BTC's favor, dismissing all claims against Nash.  Nash now appeals the summary judgment, seeking reversal solely on the racial discrimination claim.

## DISCUSSION

**Summary Judgment Pursuant to Rules 166a(c) and 166a(i)**

We review the trial court's decision to grant summary judgment *de novo*.  *Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 699 (Tex. 1994).  In reviewing a summary judgment in which the trial court has not provided the specific basis for its decision, we must review each argument asserted

---

[1] Nash initially claimed that a "police officer friend" conducted the background check for him, but later acknowledged that he ran the search on his personal computer at home.

in the motion and affirm the trial court's judgment if any of the arguments is meritorious. *See Star-Telegram, Inc. v. Doe,* 915 S.W.2d 471, 473 (Tex. 1995). BTC sought summary judgment pursuant to both Rule 166a(c) and 166a(i). *See* Tex. R. Civ. P. 166a(c), (i). The trial court granted summary judgment in favor of BTC without stating the ground. Thus, Nash must defeat all grounds for summary judgment in order to obtain a reversal on appeal.

A defendant who moves for summary judgment under Rule 166a(c) must prove that it is entitled to judgment as a matter of law either by conclusively disproving at least one element of the plaintiff's claim or by proving each element of its own affirmative defense, thereby establishing that no genuine issues of material fact remain. *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000) (per curiam). The defendant must support its motion with proper summary judgment evidence. Tex. R. Civ. P. 166a(c). Only if the defendant meets its burden does the burden shift to the plaintiff, as the nonmovant, to establish the existence of a genuine issue of material fact. *Id*.

The initial burden for a defendant who moves for summary judgment under Rule 166a(i) is different. The defendant is merely required to assert that no evidence supports at least one element of the plaintiff's claim and specify the challenged element. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 207 (Tex. 2002). The nonmoving plaintiff then carries the burden of proof to establish a genuine issue of material fact on at least one essential element of its claim. *Id*. We construe the evidence in the light most favorable to the nonmovant. *Id.* at 208. The substantive law governing the plaintiff's claim will determine what is considered an "essential element." Nash's claim is governed by employment discrimination law.

**The *McDonnell Douglas* Burden-Shifting Analysis**

At the time Nash filed his claim, the governing statute was the Texas Commission on Human Rights Act ("TCHRA"). Tex. Lab. Code Ann. §§ 21.051-.556 (West 1996). Our reading of the TCHRA is guided by analogous federal law. *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001). For decades, Texas courts have followed the burden-shifting framework established by the Supreme Court for analyzing employment discrimination cases. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* analysis involves three steps. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

At step one, the plaintiff must prove a prima facie case of discrimination. *Id*. The required elements vary depending on the plaintiff's specific allegations. *Quantum Chem. Corp.*, 47 S.W.3d at 477. If the plaintiff claims that an adverse employment decision was taken against him based on race, as here, then he must establish that: "(1) he was a member of a protected class, (2) he suffered an adverse employment action, and (3) nonprotected class employees were not treated similarly." *Farrington v. Sysco Food Servs., Inc.,* 865 S.W.2d 247, 251 (Tex. App.—Houston [1st Dist.] 1993, writ denied).[2] The plaintiff's prima facie burden is not onerous. *Burdine*, 450 U.S. at

---

[2] Both Nash and BTC recited in their briefs that the third element of the plaintiff's prima facie burden is whether the plaintiff was replaced by someone outside of the protected class. In a race discrimination case, this "may help raise an inference of discrimination, [but] it is neither a sufficient nor necessary condition." *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996). If the discrimination is based on *age*, however, most courts require proof that the plaintiff was replaced by a nonprotected class member. *See, e.g.*, *Reeves v. Sanderson Plumbing Co.*, 530 U.S. 133, 142 (2000); *Russo v. Smith Int'l*, 93 S.W.3d 428, 435 (Tex. App.—Houston [14th Dist.] 2002, pet. denied); *Jaso v. Travis County Juvenile Bd.*, 6 S.W.3d 324, 328 (Tex. App.—Austin 1999, no pet.).

253.  If the plaintiff satisfies this burden, it creates a rebuttable presumption that discrimination occurred.  *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983).

At step two the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  *Burdine*, 450 U.S. at 253.  The defendant's burden is merely one of production, not persuasion.  *Board of Trustees v. Sweeney*, 439 U.S. 24, 25 (1978).  If the defendant carried its burden at step two, the presumption of discrimination is eliminated and the burden shifts back to the plaintiff to overcome the defendant's proffered reason.  *Quantum Chem. Corp.*, 47 S.W.3d at 477.

The law is currently in flux about what the plaintiff must prove to prevail at step three.  *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004) (discussing unsettled state of current law).  For many years, Supreme Court precedent specified that there were two ways to analyze employment discrimination cases:  If the plaintiff only had circumstantial evidence of discrimination then *McDonnell Douglas's* three-step test governed, but if the plaintiff had direct evidence of discrimination, then the test set forth in *Price Waterhouse v. Hopkins* was controlling.  *Price Waterhouse,* 490 U.S. 228, 244-45 (1989); *McDonnell Douglas Corp.*, 411 U.S. at 802-05; *see also Quantum Chem. Corp.*, 47 S.W.3d at 476 (how case is analyzed depends entirely upon presence or absence of direct evidence).  Under *McDonnell Douglas*, the plaintiff's ultimate burden is to prove that the defendant's articulated reason is not the true reason for its employment decision, but instead is mere "pretext" for a discriminatory reason.  411 U.S. at 804.  The *Price Waterhouse* "mixed motive" analysis only requires that the plaintiff prove that "discrimination was a motivating factor in the employment decision, even if the employer's decision would have been identical in the absence of discrimination."  *Quantum Chem. Corp.*, 47 S.W.3d at 478.

6

Recent opinions from the United States Supreme Court and the Texas Supreme Court have caused the line between "pretext" and "motivating factor" cases to be blurred. The Texas Supreme Court in 2001 held that the plain language of the TCHRA[3] mandates that "'a motivating factor' is the correct standard of causation for the plaintiff in all TCHRA unlawful employment claims," whether the claim is based on direct or circumstantial evidence. *Id.* at 480; *see also City of Austin Police Dep't v. Brown*, 96 S.W.3d 588, 600 (Tex. App.—Austin 2002, pet. dism'd) (discussing *Quantum Chemical's* holding). The *Quantum Chemical* court did not eliminate the pretext requirement. Rather, it held that plaintiffs can prove discrimination was a "motivating factor" for the employment decision by showing that the employer's articulated reason was mere pretext. 47 S.W.3d at 481-82. In 2003, the Texas Supreme Court again stated that "motivating factor" is the proper standard of causation, even in a "pretext" case. *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739-40 (Tex. 2003). It is not sufficient for a plaintiff to prove the employer's articulated reasons are pretext for some other reason; the plaintiff must show the other reason to be one motivated by discrimination against the plaintiff's protected class. *Id.* at 740 ("The relevant inquiry is not whether the [articulated reasons] were pretext, but what they were a pretext *for*."). Thus, after *Quantum Chemical* and *Canchola*, Nash's burden of showing that BTC was motivated by discrimination can be satisfied with proof that BTC's articulated reasons are mere pretext.

---

[3] "Except as otherwise provided by this chapter, an unlawful employment practice is established when the complainant demonstrates that race, color, sex, national origin, religion, age, or disability was *a motivating factor* for an employment practice, even if other factors also motivated the practice. . ." Tex. Lab. Code Ann. § 21.125(a) (West 1996) (emphasis added).

Most recently, the United States Supreme Court held that the "mixed motive" analysis is proper in cases based wholly on circumstantial evidence as well as those based on direct evidence. *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 92 (2003). Courts have differed as to whether the *McDonnell Douglas* analysis has survived *Desert Palace. Compare Sanders v. City of Montgomery,* 319 F. Supp. 2d 1296, 1314 (M.D. Ala. 2004), *with Dunbar v. Pepsi-Cola Gen. Bottlers of Iowa, Inc.*, 285 F. Supp. 2d 1180, 1196 (N.D. Iowa 2003). We need not decide which interpretation of *Desert Palace* is correct for purposes of this case because Nash failed to produce sufficient evidence to prevail under either construction. *See Roberson*, 373 F.3d at 652 (holding that *McDonnell Douglas* did not affect outcome of appeal because appellant failed to create "a fact issue as to whether Alltel's adverse employment decision was, even in part, motivated by discriminatory animus.").

**BTC's Summary Judgment Motion**

Nash makes an initial challenge to the summary judgment by claiming that the trial court improperly held him to a higher standard of proof than was required. Nash asserts that he was held to a "preponderance" rather than a "scintilla" standard. We agree that a nonmovant satisfies his summary judgment burden by producing more than a scintilla of evidence to create a genuine issue of material fact on at least one essential element of his claim. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 124 S. Ct. 2097 (2004). Nash's claim fails, however, because nothing in the record indicates that the trial court applied the wrong standard and, in any event, Nash failed to produce even a scintilla of evidence to raise a genuine issue of material fact.

8

Under the burden-shifting framework, it is undisputed that Nash established his prima facie case at step one and that BTC satisfied its burden at step two by articulating three violations of company policy as legitimate, nondiscriminatory reasons for Nash's termination. The only essential element about which Nash could raise a genuine issue of material fact, then, is whether BTC's articulated reasons were legitimate, or were instead mere pretext for a true, discriminatory motivation.

"To establish a fact question on the issue of pretext, the nonmovant must present evidence indicating that the nondiscriminatory reason given by the employer is false or not credible, *and that the real reason for the employment action was unlawful discrimination*." *Elgaghil v. Tarrant County Junior Coll.,* 45 S.W.3d 133, 140 (Tex. App.—Fort Worth 2000, pet. denied) (emphasis added). In an attempt to satisfy this burden, Nash argues that BTC's articulated reasons varied over time, that BTC's investigation was flawed and produced no evidence of a legitimate reason to terminate Nash, and that BTC's racial discrimination is evidenced by the comment of John Gabbert, a subordinate employee. None of these allegations create a genuine issue of material fact about whether BTC's articulated reasons were legitimate or pretextual, and Nash has failed to adduce any affirmative proof of racial discrimination by BTC.

### *Consistency of BTC's Articulated Reasons*

Nash claims that a genuine issue of material fact remains at step three based on a statement given by Ballinger in June 2001 to a Texas Workforce Commission (TWC) Operator[4]

---

[4] The TWC conducted an "appeal tribunal hearing" over the telephone as an administrative fact-finding process in a claim Nash filed seeking unemployment compensation.

regarding why Nash was terminated. Ballinger told the operator that the "real reason" Nash was fired was for sexual harassment. According to Nash, Ballinger's statement implies that his termination was based on a single policy violation and is therefore inconsistent with the decision that Nash was terminated for violating three policies. Nash's claim is without merit.

Although Ballinger did refer to sexual harassment as the "real reason," she also explained the two other policy violations to the operator. Ballinger testified that there were always three reasons leading to Nash's termination and that her statement about the "real reason" was given in response to the operator's request for a "primary" reason, not that Nash's sexually harassing conduct was the "sole" reason for his termination. Ballinger's testimony is supported by Nash's own statement to the TWC on May 21, 2001, the day he was fired. Nash listed all three violations of policy as the reasons Ballinger expressed to him for BTC's decision. The record evidences that BTC has consistently articulated Nash's three policy violations as its legitimate, nondiscriminatory grounds for Nash's termination, and Nash failed to produce a scintilla of evidence to raise a genuine issue of material fact about whether BTC's reasons were mere pretext for a discriminatory motive.

### BTC's Investigation

Nash also attempts to create a genuine issue of material fact about the legitimacy of BTC's articulated reasons by claiming that Ballinger's investigation reached inaccurate conclusions on each of the three allegations against him. First, Nash challenges the finding that he violated BTC's sexual harassment policy. He claims Ballinger did not interview the proper witnesses and that the allegation was fabricated by Benites in retaliation against Nash for Nash's report of Benites's suspected drug use. Nash asserts that Ballinger should have interviewed Aurelia Cruz, another co-worker whom Nash claims was present at the time he allegedly made the inappropriate

10

comment about the housekeeper. Nothing in the record shows that Nash informed Ballinger about Cruz or asked Ballinger to interview her, and Nash did not offer an affidavit by Cruz at the summary judgment hearing.

Nash also fails to satisfy his burden by pointing to Benites's motivations. Nash did not produce evidence that any possible animosity felt by Benites against Nash was based on race. Even if Benites had improper motives for making the allegation against Nash, that does not provide any evidence of racial discrimination by BTC. Nash does not allege that Benites exerted influence over Ballinger or Hall, the primary decisionmakers, to cause Nash's termination. *See Roberson*, 373 F.3d at 653. Finally, two other employees corroborated Benites's report that Nash made sexual comments about the housekeeper and requested that she be brought to his office. These facts evidence a legitimate reason for Nash's termination based on his misconduct, not his race.

Nash also challenges the finding that he violated company policy by initiating discussion with subordinates about Benites's possible drug use. He claims that the witnesses who reported this violation to Ballinger were lying. "[An employee's] subjective belief that he was terminated based on race . . . is insufficient to create a fact issue about whether [an employer's] legitimate nondiscriminatory reason for terminating [him] was pretextual." *M.D. Anderson Hosp. & Tumor Inst.*, 28 S.W.3d at 25. Moreover, "an employee's subjective belief that an employer gave a false reason for its employment decision is not competent summary judgment evidence." *Elgaghil* 45 S.W.3d at 141. Ballinger had sufficient reports from which to conclude that Nash violated BTC's confidentiality policy. Nash provided Ballinger with the names of four subordinate employees whom he claimed approached him, a manager, with reports that Benites was using drugs. Ballinger interviewed each of these four, plus one additional employee from Benites's department. All five

11

told Ballinger that they did not have any personal knowledge of Benites using drugs or alcohol at work and that they had not made such a report. Two told Ballinger that Nash approached them to discuss his suspicions about Benites. Nash did not produce any evidence to support his claim that these five witnesses lied to Ballinger. Nash's subjective belief is not sufficient to overcome the evidence produced by BTC.

Regarding the third allegation, Nash does not deny that he conducted an unauthorized background check on Benites; he only asserts that such conduct did not constitute a violation of BTC's policy. His claim does not provide a scintilla of evidence to overcome BTC's legitimate reasons for Nash's termination.

In sum, Nash's challenge to Ballinger's investigation fails to satisfy his burden because he does not claim that the investigation was inadequate, but only that its results were incorrect. "[I]t is not sufficient for [the employee] to present evidence that the [employer's] investigation was imperfect. . . ." *Canchola*, 121 S.W.3d at 740. Nash was an at-will employee whom BTC was entitled to fire for any reason, as long as it was not illegal. *See id.* Any one of the three policy violations provides BTC with a legitimate basis for firing Nash. The evidence in the record supports both the conclusions reached by Ballinger's investigation—that Nash violated three company policies—and BTC's articulation that Nash was terminated based on this misconduct. There is no evidence to support Nash's subjective belief that his termination was based on his race.

***Stray Remarks and the Lack of Affirmative Proof of Discrimination***

Nash also sought to overcome BTC's articulated reasons and adduce affirmative evidence of discrimination by pointing to a racial comment made in the workplace by John Gabbert, a subordinate employee. Nash provides the affidavit of Paul Aleman, a former BTC employee, to

12

support his claim. Even if Gabbert made the allegedly discriminatory statement, it does not create a fact issue about whether BTC's decision was motivated by discrimination. Workplace comments do not provide sufficient evidence of a discriminatory animus on behalf of the employer unless they are "(1) related to plaintiff's protected class, (2) proximate in time to the adverse employment decision, (3) made by an individual with authority over the employment decision at issue, and (4) related to the employment decision at issue." *Elgaghil*, 45 S.W.3d at 140 (citing *Krystek v. University of S. Miss.*, 164 F.3d 251, 256 (5th Cir. 1999)). Otherwise, such comments are merely stray remarks that, standing alone, provide no evidence of discrimination. *Id*.

It is undisputed that Gabbert was not a decisionmaker; Nash was Gabbert's manager. Nash never reported Gabbert's alleged comment to any decisionmaker and there is no evidence that the decisionmakers otherwise knew about his comment. Nor is there any evidence to suggest that Gabbert had any influence with or over the decisionmakers. Aleman's affidavit states that this comment was made in "late 2000," approximately five months prior to Nash's termination. Because the pivotal events in Nash's termination did not begin until a month before the decision was made, Gabbert's comment was not proximate in time to the employment decision. Stray remarks, remote in time from Nash's termination, and not made by anyone directly connected with the decision, are not enough to raise a fact question about whether BTC's reasons for terminating Nash were pretextual. *See M.D. Anderson Hosp. & Tumor Inst.*, 28 S.W.3d at 25.

Nash's own testimony also demonstrates his lack of affirmative proof. Nash testified that he did not believe that Ballinger or Hall, the two decisionmakers, were racist. He could not identify any instance where either Ballinger or Hall had been unfair towards an African-American

13

or other minority. Nash acknowledged that he and Hall had a good working relationship. Nash also conceded that, prior to this lawsuit, he never complained to any supervisor or government agency about racial discrimination at BTC.

The record shows that Nash's claim that he was terminated because of his race is based on nothing more than his subjective beliefs. At most, it amounts to "mere surmise or suspicion" and does not constitute a scintilla of evidence sufficient to create a fact issue. *See Gold v. Exxon Corp.*, 960 S.W.2d 378, 384 (Tex. App.—Houston [14th Dist.] 1998, no pet.). Nash cannot meet his burden simply by denying the allegations against him and making conclusory statements that he was discriminated against because "some suspicion linked to another suspicion produces only more suspicion, which is not the same as some evidence." *King Ranch, Inc.*, 118 S.W.3d at 755. Nash's first issue is overruled.

**Same Actor Inference**

Nash next argues that the trial court erred in giving a "weighty" preference to BTC regarding the "same actor" inference. It is undisputed that the same actor inference applies in this case because Ballinger and Hall made both the decisions to hire and to fire Nash. When a plaintiff is both hired and fired by the same decisionmaker, an inference arises that the adverse employment decision is not motivated by discrimination, because it would be illogical to hire someone possessing a characteristic the employer disliked, "only to fire them once they are on the job" based on that same characteristic. *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996). The inference in favor of the defendant is "even more weighty" when the decisionmaker is also a member of the same protected class as the plaintiff. *Ralkin v. New York City Transit Auth.*, 62 F. Supp. 2d. 989, 1000

14

(E.D.N.Y. 1999). Neither Ballinger nor Hall belong to Nash's protected class. Nothing in the record, however, suggests that the trial court gave the inference any undue weight. The summary judgment was granted based on Nash's failure to meet his burden of proof by creating a genuine issue of material fact at step three, not because the trial court relied on the same actor inference. Nash's second issue is overruled.

**Evidentiary Rulings**

In his third issue, Nash asserts that the trial court erred by admitting portions of Ballinger's affidavit and by excluding the notes made by the TWC Operator. At the summary judgment hearing, Nash objected to the admission of two parts of Ballinger's affidavit. He first objected to her statement that "[t]o my knowledge, Benites did not know about Nash's complaint before he made his complaint about the housekeeper incident," on the grounds that she could not have personal knowledge about what Benites knew and that the affidavit was contradictory to her other testimony. He also objected to the portion of Ballinger's affidavit where she explained the three violations of company policy that provided BTC's basis for his termination. Nash claims this statement contained legal conclusions and was contradictory to her other testimony. The trial court overruled both objections and admitted the affidavit in full.

The trial court did not err in overruling Nash's first objection because Ballinger's statement was based on personal knowledge and there was no evidence contradicting it. Ballinger's affidavit sets forth the beliefs she formed through her investigation. The decisionmaker's personal thought process is relevant in an employment discrimination case. Ballinger's statement is not inconsistent with her testimony that she knew Nash had previously reported his suspicions about

15

Benites to Pate, Benites's manager. No evidence suggests that Pate revealed to Benites that Nash had made such a report. Even if Benites was aware of Nash's allegations, this does not provide any evidence of racial discrimination on behalf of BTC. There is also no evidence to show that Benites exerted any influence over Ballinger or Hall and, without more, the potential biases of a subordinate employee cannot be imputed to the decisionmakers. *See Roberson*, 373 F.3d at 653.

The trial court also did not err in overruling Nash's second objection to Ballinger's affidavit because it was without merit. The employer has the burden of proof in a discrimination case to articulate legitimate, nondiscriminatory reasons behind its employment decision. *See McDonnell Douglas Corp.*, 411 U.S. at 803. Ballinger, as the decisionmaker, was not only permitted, but required, to testify about the reasons for Nash's termination in order to satisfy BTC's burden at step two. BTC consistently articulated Nash's three violations of company policy as its legitimate reasons for his termination. Our conclusion that Nash failed to create a genuine issue of material fact regarding BTC's true motivations is therefore not affected by the trial court's admission of Ballinger's affidavit.

Finally, Nash claims that the trial court erred by excluding the TWC Operator's notes. When Nash offered the notes, BTC objected that they were inadmissible according to section 213.007 of the Texas Labor Code and that they were hearsay not falling within any exception. *See* Tex. Lab. Code Ann. § 213.007; Tex. R. Evid. 801-06. The trial court sustained BTC's objection and excluded the notes. Without reaching BTC's specific objections, we find that even if the court should have admitted the notes, it was not harmful error to exclude them because nothing in the notes supports Nash's attempt to raise a genuine issue of material fact. The notes confirm BTC's

evidence of the three legitimate, nondiscriminatory reasons for Nash's termination. Nash's third issue is overruled.

**CONCLUSION**

Nash failed to adduce a scintilla of evidence to raise a genuine issue of material fact about the essential element of whether BTC's articulated reasons for his termination were legitimate or were mere pretext for a true discriminatory animus. Nash also produced no affirmative evidence of racially discriminatory practices or conduct attributable to BTC or its decisionmakers. Because BTC satisfied its burden at step two and Nash was unable to overcome BTC's evidence at step three, we overrule his issues on appeal and affirm the judgment in favor of BTC.

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   December 16, 2004

17